UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

CRIMINAL NO. 08-02-DCR

UNITED STATES OF AMERICA                                                                    PLAINTIFF

VS:            RECOMMENDED DISPOSITION OF MOTION TO SUPPRESS

LATOYA MARIE HORN                                                                              DEFENDANT

\* \* \* \* \*

The Court considers a motion to suppress filed by Defendant Latoya Marie Horn and referred by the District Judge.[1]  *See* DE #29.  The indictment charges Horn and Co-Defendant Andre Deshawn Lundy with possession of oxycodone with intent to distribute, in violation of 21 U.S.C. § 841(a)(1).  *See* DE #11.  An encounter between Horn and DEA agents at a Sonic restaurant in Corbin, Kentucky is the focal point of the motion.  Police obtained evidence and incriminating statements from Horn during the ensuing investigation.  Horn argues that the encounter was an unjustified investigatory stop.  Defendant asserts that the unlawful stop tainted the evidence and statements subsequently seized or obtained by authorities.

The United States responds that the initial contact was consensual, but also argues that police had reasonable suspicion to stop Horn.  *See* DE #34.  Based on the information that Horn provided during the stop, the United States further asserts that police had valid cause to extend Horn's

---

[1] Also pending is a second motion filed by Horn requesting that the United States disclose the identity of a confidential source that assisted authorities in the underlying investigation.  *See* DE #30.  Because the disclosure issue is a non-dispositive pretrial discovery matter, the Court resolves that motion in a separate order, per 28 U.S.C. 636(b)(1)(A).

detention and to continue the investigation of Horn and Lundy. Following an evidentiary hearing, the matter is now ripe for decision. *See* DE #35. For the reasons stated, the Court recommends that the District Court DENY Horn's motion to suppress.

I.

The Court conducted an evidentiary hearing in this matter on March 10, 2008. *See id.* DEA Special Agent Jerel Hughes was the only witness to testify. Hughes, who related the event leading to the Sonic confrontation, did not have personal knowledge as to all aspects of his testimony, but the Rules of Evidence generally are not applicable to pretrial suppression hearings. *See, e.g., United States v. Killebrew*, 594 F.2d 1103, 1105 (6th Cir. 1979); *United States v. Clark*, 136 F.App'x 831, 833 (6th Cir. June 10, 2005).

Hughes explained that information provided by a cooperating source ("CS") triggered the investigation. *See* DE #37 at 8 (hereinafter "Hearing"). Detective Brian Centers of the Barbourville Police Department was the officer who developed the contact with the CS. According to Hughes, the CS informed Centers that he had obtained "large quantities" of oxycontin over an "extended period of time" from a supplier in Detroit, Michigan, identified as Andre Deshawn Lundy. *See id.* The CS agreed to cooperate in an investigation of Lundy. *See id.*

Hughes first met the CS on January 7, 2008 at the DEA office in London, Kentucky. *See id.* At the interview, the CS reported "numerous" previous Oxycotin purchases from Lundy spanning an "extensive period of time." *See id.* The CS also described Lundy to Hughes as a black male. *See id.* at 14, 48. To corroborate the information, the CS made a recorded phone call to Lundy during the interview. *See id.* at 8-9.

Centers next contacted Hughes on January 12, 2008. According to Hughes, the CS had informed Centers that Lundy would be en route to execute a transaction the next day, on January 13. *See id*. at 9-10. The following day, Centers relayed to Hughes a report from the CS that Lundy was in Tennessee and would be sending his sister to make the exchange. *See id*. at 10. It appears that Centers was not with the CS during this contact from Lundy. Instead, Hughes indicated that the CS was negotiating with Lundy from the informant's residence. Centers also informed Hughes that the CS had left the residence to travel to Corbin, Kentucky. *See id*.

Hughes explained at the hearing that he was "curious" about the informant's decision to head toward Corbin. *See id*. at 10-11. The special agent located the CS on the way to Corbin. He followed the CS "around Corbin for a short period of time" and observed the CS pick-up another person at a Hardee's restaurant. Hughes later approached the vehicle when the CS made another stop. After the CS consented to a vehicle search, Hughes testified that he discovered a spoon and syringe that appeared to contain drug residue. *See id*. at 11. Hughes took the CS into custody and decided that the CS would have no active prospective involvement in the investigation, "as far as a meet or an exchange of any type." *See id*. As a result, no controlled purchase occurred. *See id*. The CS, however, was by that point in a car with Detective Centers and continued the negotiations with Lundy. *See id*. at 12-13.

In a subsequent phone conversation, Lundy agreed that his sister would meet the CS at 3:00 p.m. at a Sonic restaurant in Corbin, Kentucky. *See id*. at 13. Afterwards, Hughes indicated that additional phone calls between the CS and Lundy occurred. In one of the phone calls, Lundy informed the CS, "She's there waiting on you." *See id*. Hughes himself was not in the car for any

3

of these conversations, but he testified that Centers was present and monitored the calls.[2] Hughes also believed that the CS had Lundy on speakerphone, with Centers present. Hughes explained that he received the information from Centers promptly via radio. *See id.*

Once Lundy selected the Sonic as the transaction site, Hughes and additional DEA agents instituted surveillance. *See id.* at 13-14. As a result, law enforcement was in place at the Sonic when Centers reported to Hughes that the target was "waiting." *See id.* at 14. Hughes suspected Defendant's vehicle, which was already at the scene when Hughes arrived. *See id.* at 29. The car had Ohio tags, and a registration check confirmed that the vehicle was a rental. *See id.* at 14. According to Hughes, the CS had told investigators previously that Lundy "drove rental cars."[3] *See id.* Hughes also testified that rental car use by drug traffickers is, based on his experience and training as a DEA agent, "very, very typical." *See id.* at 15. Finally, Special Agent Hughes testified that Defendant was the *only* black female present at the designated location and time. *See id.* Defendant's race and gender were significant because a) the CS had specifically described Lundy as a black male and b) Lundy had indicated to the CS that his "sister" would complete the transaction. *See id.* at 13-15, 48.

Based on this information, Hughes decided to approach Horn's vehicle. *See id.* at 16-17. The car was parked in a drive-in bay. Testimony indicated that a one-way drive circled the restaurant and drive-in parking spaces. Hughes, traveling in an unmarked Ford Explorer, pulled his vehicle just past Horn's parking spot. As such, the position of the Explorer did not impede Horn

---

[2] Police, however, did not record these calls. *See* Hearing at 12.

[3] Hughes could not confirm whether he received this information directly from the CS. *See* Hearing at 28-29.

from *exiting* the drive-in bay, but Horn could not move forward and leave the restaurant lot once she had backed-out. Hughes agreed that his Explorer effectively blocked Horn from leaving the premises. *See id*. at 48-49; *see also id*. at 18, 29-30.

Hughes testified that he alighted from his unmarked vehicle as Horn exited her parking space. *See id*. at 49; *see also id*. at 17, 29-30. According to Hughes, he approached Horn's vehicle on the driver's side, was in plainclothes with badge shown, and displayed no weapon. *See id*. at 16-18, 30, 49. Testimony indicated that Defendant honked her horn sometime either before or during Hughes's approach. *See id*. at 30. Hughes stated that he tapped on the car window and showed his badge. *See id*. at 16-19, 30, 50. He believed Horn rolled-down the driver's side window. *See id*. at 50. Hughes then asked if he could speak to Horn and for her identification.[4] *See id*. at 16-17, 19. Horn complied. According to Hughes, Horn's identification indicated that she was from Detroit, Michigan.[5] *See id*. at 17, 19.

Hughes next asked Horn for consent to search the vehicle. At about the same time, two additional DEA agents approached the scene. *See id*. at 19; *see also id*. at 30. Hughes recalled that Horn made an unsolicited statement to one of the agents that "there were no pills were in the car." Horn claimed instead that the pills were in room 204 "at the Knights Inn." *See id*. at 19-20. Hughes

---

[4] Agent Hughes could not recall his exact language. However, Hughes indicated that he is "overly polite in these situations," and he was certain that he phrased his comments to Horn as a request or question – not as an order or command. *See* Hearing at 50; *see also id*. at 17-18. Hughes also could not recall on cross examination whether or when he instructed Horn to exit the vehicle, but he testified that he "normally" asks occupants to "step outside to talk." *See id*. at 30; *but see id*. at 18-19 ("Q: Did you tell her to get out of the vehicle? A: No, sir.").

[5] Horn also may have told Hughes that she is from Detroit. *See* Hearing at 19.

stayed at the Sonic to investigate Horn as other officers investigated the Knights Inn location identified by Defendant. *See id*. at 35, 38.

In addition to the unsolicited statements, Horn consented to the vehicle search. *See id*. at 20, 32. The officers located no substances in the vehicle, but did find a room key for the Baymont Inn. *See id*. at 20. After searching the car, Hughes asked Horn if she had any pills on her person. Horn answered "no." Hughes testified that he then placed Horn in the back of a marked police cruiser to be interviewed, and Hughes confirmed that he provided *Miranda* warnings. *See id*. at 20; *see also id*. at 34. Hughes could not recall whether Horn was in handcuffs, but he conceded that she may have been. *See id*. at 34. According to Hughes, Horn provided multiple stories. One explanation was that she was at Sonic to pick up money from a white male. Horn also stated that a person named "Spoon" directed her to the Sonic, but "Spoon" provided no pills because he suspected a trap. *See id*. at 54-55; *see also id*. at 20-21.

At the end of the interview, Hughes testified that he removed Horn from the cruiser to search her person. *See id*. at 21. Among other things, Hughes instructed Horn to "pull" her "pants tight around her body." *See id*. Hughes reported that he and another agent observed a bulge "to the left of" Defendant's crotch. *See id*. Because no female officer was available, Hughes did not conduct a full body search at that time. After some difficulty, someone at the scene located a female dispatcher with the London Police Department who could perform the search. *See id*. at 21-22; *see also id*. at 41-42.

In the meantime, officers at the Knights Inn reported no indication of confirmatory activity at that location. *See id*. at 38. Based on the room key found in Defendant's car, the investigation shifted to the Baymont Inn. Law enforcement located Lundy at that motel and contacted Hughes.

Hughes thus left the Sonic and traveled to the Baymont Inn. *See id*. at 22, 35, 51. Horn accompanied Hughes in the front passenger seat of his Explorer. *See id*. at 35-36; *see also id*. at 51. Hughes did not remember whether Horn was yet in handcuffs. *See id*. at 36.

Upon arrival at the Baymont Inn, Hughes stated that he read Lundy his *Miranda* rights and interviewed the suspect. *See id*. at 22. Lundy had a black bag in his possession. Law enforcement asked Lundy for consent to search the bag and the hotel room. Lundy refused consent initially, but ultimately allowed officers to search both the bag and the room. Lundy informed investigators that he had a large quantity of Oxycontin in the bag. He explained that Horn took approximately 100 pills for the Sonic transaction. However, a search of the bag and the motel room located no drugs. Lundy responded that Horn must have taken all the pills. *See id*. at 22-23; *see also id*. at 37.

It appears that Horn was in the backseat of a police cruiser during the investigation at the Baymont Inn. *See id*. at 36 ("Q: But you did have her out of the truck at the Baymont Inn? A: I believe at the Baymont Inn she got out of my Explorer and got back into the rear of the police car."). Hughes did not recall taking Horn inside the motel, but he did ask Horn for consent to search the room. *See id*. at 36-37. The investigation report indicated that Horn consented "while continuing to deny the existence of any pills."[6] *See id*. at 37.

After the investigation ended at the Baymont Inn, authorities transported Horn in a police cruiser to the London Police Department. Hughes still could not confirm whether Horn was in handcuffs, but he "assumed" she was. *See id*. at 39. A female dispatcher conducted a body search of Horn at the police station but found no drugs. However, police then located 270 Oxycontin pills

---

[6] Neither party introduced the investigation report as an exhibit at the hearing. The report is thus not in the court record.

in the backseat area of the police car that transported Horn to the station. *See id.* at 23. Hughes was not present for either search, but he later confronted Horn with the pills recovered from the cruiser. *See id.* at 32, 40-41. According to Hughes, Horn admitted that she had hidden the drugs in her crotch, shaken the package down her leg, and concealed the pills in the police car.[7] *See id.* at 23; *see also id.* at 55. Hughes testified that he did not provide fresh *Miranda* warnings prior to this second confrontation.[8] *See id.* at 52-53.

II.

According to Defendant, the drugs and incriminating statements that police obtained from Horn are the fruits of an impermissible investigatory detention initiated by Agent Hughes at the Sonic restaurant. The United States describes the encounter as consensual, but argues that police also had adequate justification to stop Horn. In addition, the United States contends that police had sufficent cause to extend Horn's detention and the investigation, based on statements that Defendant volunteered during the stop.

The analysis, as framed by the parties, depends heavily on the scope of the interaction between Horn and law enforcement at each particular stage in the investigation. Federal law recognizes essentially three types of "permissible encounters" between police and citizens:

> 1) the consensual encounter, which may be initiated without any objective level of suspicion; 2) the investigative detention, which, if non-consensual,

---

[7] Hughes confirmed that Lundy was never in the cruiser that transported Horn to the London Police Department. *See* Hearing at 51-52.

[8] Hughes also did not obtain a written statement from Horn. Similarly, defense counsel attacked Hughes at the hearing because he did not utilize a written consent to search form or *Miranda* waiver. The Court notes that such devices are a helpful evidentiary tool, but not required by law.

> must be supported by a reasonable, articulable suspicion of criminal activity; and 3) the arrest, valid only if supported by probable cause.

*United States v. Davis*, 514 F.3d 596, 607 (6th Cir. 2008).

Plainly, not every interaction between citizens and police involves a seizure. *See Terry v. Ohio*, 88 S.Ct. 1868, 1879 n.16 (1968). Instead, a seizure occurs only when a police officer terminates or restrains an individual's freedom of movement by means of physical force or a show of authority. *See Florida v. Bostick*, 111 S.Ct. 2382, 2386 (1991). The test generally applied by the Supreme Court considers whether a reasonable person, in view of all the surrounding circumstances, would have believed that he was not free to leave. *See United States v. Mendenhall*, 100 S.Ct. 1870, 1877 (1980). Relevant factors in this analysis may include: the threatening presence of several officers; the display of a weapon; some physical touching by the officer; or the use of language or tone of voice indicating that compliance is mandatory. *See id*.

In addition, the burden is on Horn to show that some form of detention occurred. *See, e.g., United States v. Urrea*, 1990 WL 57303, at *2 (9th Cir. May 4, 1990)("Urrea has not met his initial burden of showing that a stop occurred."). In the suppression context, the defendant, as an initial matter, must establish a basis for the motion. *See, e.g., United States v. Barr*, 454 F.Supp.2d 229, 252 (E.D. Pa. 2006). Because a consensual encounter is not a seizure, the Fourth Amendment has no application or role in that scenario. *See United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997)("The consensual encounter, however, is not a seizure and hence not governed by the Fourth Amendment[.]"). The Court notes that no witness or other proof contradicted Hughes's testimony.

In this case, the facts show that Agent Hughes pulled his unmarked Ford Explorer just past the parking space occupied by Horn's vehicle. Hughes parked his vehicle in the drive and exited the Explorer as Horn backed-out from the drive-in bay. The position of the Explorer did not prevent

9

Horn from exiting the parking space, but Hughes confirmed that his Explorer blocked Horn from moving forward and leaving the restaurant premises. At some point, Defendant honked at Hughes. Hughes approached Horn's driver-side in plainclothes. He also did not display a weapon, but showed his badge. Hughes knocked on the window, asked if he could speak to Horn, and asked Horn for identification. Horn produced identification and may have informed Hughes that she was from Detroit. At about this time, two additional agents approached Horn's vehicle as Hughes asked for consent to search the car. Horn volunteered confirmatory information about "pills" and consented to the search.

Horn asserts that these facts establish a seizure. In the Court's view, the determination is close. The fact that a single, plainclothes officer engaged Horn's vehicle without displaying a weapon suggests no seizure. *See, e.g., United States v. Springer*, 946 F.2d 1012, 1016 (2d Cir. 1991)("[W]e conclude that no seizure occurred . . . . Only a single officer, Johnson, initially approached. He was in plain clothes and displayed no weapon."). Furthermore, Hughes did not transform the encounter into a detention merely by identifying himself as a law enforcement agent, by asking to speak to Horn, or by asking Defendant for her identification. *See Florida v. Royer*, 103 S.Ct. 1319, 1324 (1983). There also is no indication that Hughes physically touched Horn during the approach or used an authoritative tone. *See Mendenhall*, 100 S.Ct. at 1877.

The critical factor, however, is the way that Hughes positioned his Explorer to block Horn from exiting the premises. The Explorer's orientation allowed Horn to back out of the parking space, but it functionally thwarted her departure. Under these circumstances, this Court believes and federal authorities indicate that a reasonable person would not feel free to leave. *Compare United States v. Packer*, 15 F.3d 654, 657 (7th Cir. 1994)(holding officers effected seizure when they parked

in front of and behind a suspect's car) and *United States v. Pavelski*, 789 F.2d 485 488-89 (7th Cir. 1986)(finding no seizure when police parked behind and on one side of a suspect's car, but seizure occurred when a third police car parked in front of the suspect's car) *with United States v. Hendricks*, 319 F.3d 993, 1001 (7th Cir. 2003)(finding no seizure where police car parked fifteen feet behind the suspect's car and did not block the suspect's vehicle from exiting); *see also United States v. Baldwin*, 114 F.App'x 675, 678 (6th Cir. 2004)("The position of the two police cruisers effectively surrounded and blocked [the suspect's] car on what was described . . . as a 'small' one-way street. Given this configuration of vehicles at the time of the encounter, a reasonable person in [the suspect's] situation would not have felt free to leave[.]").

In addition, Horn was actually in the process of leaving and her vehicle was physically in motion before Hughes ever left his Explorer. If Horn's exit had been clear, the Court notes that Hughes probably could have signaled to Horn as she left, or asked Horn to stop her car, without effecting a seizure. *See United States v. Caicedo*, 85 F.3d 1184, 1191 (6th Cir. 1996)(finding no seizure where officer "asked for permission to speak to either [the driver or passenger] as [defendant] drove toward the exit, and that [defendant] voluntarily stopped the car"); *United States v. Adegbite*, 846 F.2d 834, 838 (2d Cir. 1988)("We regard this situation, where the car had barely started in a parking lot, moved only fifteen to twenty yards, and was waved to a halt by DEA agents on foot and in plain clothes, as being more analogous to the cases of pedestrians and parked cars[.]"). Similarly, the engagement probably would have been consensual if it were a non-law enforcement vehicle that blocked Horn's progress. However, the particular combination of factors in this case – *i.e.*, a vehicle positioned by police as a barrier to thwart the progress of a moving vehicle and to allow an approach – indicates a stop. Horn saw an identified agent approach and

begin to ask questions, and she could not leave the scene because of the agent's conduct. Only an unreasonably brazen person would feel free to leave when an agent has blocked the path of egress.

For the reasons stated, the Court rejects the Government's contention that the encounter at Sonic was consensual. As such, the burden shifts to the United States to justify the investigatory detention by showing that police had a reasonable suspicion, supported by articulable facts, that criminal activity was afoot. *See United States v. Sokolow*, 109 S.Ct. 1581, 1585 (1989)(citing *Terry*, 88 S.Ct. at 1884-85). The foundation for the investigation in this case was the information received from the CS and the multiple-monitored communications between the CS and his supplier. The CS informed authorities that he had made "numerous" purchases of "large quantities" of Oxycontin from a supplier in Detroit, Michigan named Andre Deshawn Lundy. To provide verification, the CS made a corroborative recorded phone call to Lundy during the January 7, 2008 interview with police. The CS described Lundy as a black male.

After the interview session, the CS received information on January 12 that Lundy was en route and would make a transaction the next day. On January 13, the CS and Lundy engaged in a series of phone calls to negotiate a particular time and place for the transaction, which Lundy chose. Police were able to monitor most of the phone calls. The communications from Lundy indicated that he was sending his "sister" to make the exchange at the Sonic restaurant in Corbin, Kentucky at 3:00 p.m.

Hughes and his team set up surveillance at the restaurant. Based on the description of Lundy, and Lundy's reference to his sister, Hughes expected the suspect to be a black female. According to Hughes, Defendant was the *only* black female present at the designated time and location. Moreover, Hughes received confirmation, as reported to the CS (and the listening Centers)

12

by Lundy and immediately relayed to Hughes, that the suspect was, in fact, "waiting" at the restaurant. In addition, Defendant's vehicle had Ohio tags, and a registration check showed that the car was rented. According to Hughes, the CS had informed police that Lundy uses rental cars. The information was also consistent with Hughes's training and experience regarding rental car use by drug traffickers as "very typical."

On this record, the Court finds that police identified sufficient "articulable facts" to support a reasonable suspicion of drug trafficking and to justify a brief *Terry* detention of Defendant. First, despite Hughes having no prior relationship with the CS, the information about Lundy and the monitored phone calls indicating that an imminent drug transaction had significant credibility, based on the substance of the communications and the stage of the negotiations. Second, police reasonably expected the suspect to be a black female. The Sixth Circuit recognized, in an unpublished decision, that a description of this nature may provide a "specific focus" for police surveillance, but would not justify a stop of "all black females." *See United States v. Johnson*, 1990 WL 51384, at *3 (6th Cir. April 23, 1990). Here, however, Hughes received credible and timely information – coming directly from Lundy – that the suspect was "waiting" at the designated location; Defendant was the **only** individual that fit the description at the time. The prohibition against stopping "all" individuals that match a generic description is inapplicable in a scenario where just one person, in a limited geographical and temporal setting, fills the criteria. Finally, information that Defendant was in a rental car, that Lundy was known to use rental cars, and that drug traffickers typically use rental cars, provided additional support to stop Defendant.

Furthermore, the Court finds that the stop by Hughes was reasonably related in scope, concerning the stop basis. *See Terry*, 88 S.Ct. at 1884 ("Thus, evidence may not be introduced if

13

it was discovered by means of a seizure and search which were not reasonably related in scope to the justification for their initiation."). After Hughes approached Horn's vehicle, his testimony indicates that he asked if he could speak to her and requested identification. As a general matter, federal authorities recognize that police may validly request identification during an investigatory detention. *See United States v. Christian*, 356 F.3d 1103, 1107 (9th Cir. 2004); *United States v. Dawdy*, 46 F.3d 1427, 1430 (8th Cir. 1995); *United States v. Fields*, 178 F.App'x 890, 894 (11th Cir. 2006). Here, the request plainly related to the basis for the stop. Hughes believed he could bolster his investigation of Horn by determining whether she was from Detroit, Michigan, like Lundy. Indeed, the identification and information that Horn provided to Hughes verified that Horn is from Detroit.

Hughes next asked Horn for consent to search the vehicle. Because police had reasonable suspicion to believe that Defendant was at the Sonic to complete a drug transaction, and because her established domicile tended to confirm that suspicion, Hughes had a reasonable basis to suspect that drugs would be either in the car or on Horn's person. The request for permission to search the vehicle therefore did not exceed the proper scope of the investigatory stop. *See Terry*, 88 S.Ct. at 1884.

In response to the request to search, Horn, without apparent solicitation or prompting, denied having any "pills" in the vehicle. Horn also volunteered to police that the "pills" were at room 204 at the Knights Inn. Notably, nothing in the record indicates that the detention had progressed from a stop to an arrest when Horn volunteered the statements. Instead, it appears that Horn offered the information immediately after Hughes asked for consent to search, which was within the legitimate scope of the stop. Police thus obtained the statements properly.

14

The statements also did not implicate *Miranda*, which applies only to statements elicited during a "custodial interrogation." *See Miranda v. Arizona*, 86 S.Ct. 1602, 1612 (1966). In this case, the unrefuted testimony shows that Horn volunteered the information to police. As such, no interrogation occurred. In addition, courts generally do not classify investigatory stops as "custodial" detentions for *Miranda* purposes. *See, e.g., United States v. Swanson*, 341 F.3d 524, 528-29 (6th Cir. 2003).

The Court also finds that Horn's incriminating statements, in combination with information that she is from Detroit and the background already known to police when Hughes first engaged Horn, provided probable cause for Defendant's arrest. Critically, Horn identified, without query or provocation, the location of illicit substances, which was the focus of the investigation. Horn, already linked to Detroit, tied herself to "pills" and gave a location for the "pills." She confirmed her nexus to the Lundy OC negotiations. The collective evidence, in the Court's judgment, would "lead a reasonable person to believe that there is probability" that Horn was involved in the arranged drug transaction. *See United States v. Martin*, 289 F.3d 392, 400 (6th Cir. 2002). Therefore, the Court need not determine when authorities, as a legal matter, actually arrested Horn. The record establishes an adequate basis for such detention from just after the stop began.[9]

Finally, the Court considers the incriminating statements that Horn provided when Hughes confronted her with the drugs recovered from the cruiser. The Court notes that Defendant does not contend that the statements violated *Miranda*. Moreover, the record establishes that Hughes advised Horn of her *Miranda* rights before the first interview at the Sonic in the police cruiser. Obviously,

---

[9] The Court also notes that Defendant does not contest the validity of her consent to search the vehicle, which produced the room key that led authorities to Lundy. Lundy also provided incriminating statements implicating himself and Horn.

15

the statements that Horn made at the police station occurred later and at a different location. As a general matter, federal authorities do not require re-warning merely because of a passage of time, particularly when the time lapse involves only a few hours. *See, e.g., United States v. Weekley*, 130 F.3d 747, 751 (6th Cir. 1997)(collecting cases). This case also included a change in location, but considering the totality of the circumstances, and Horn's failure to challenge overtly the admissibility of the statements, the Court finds that the statements were proper.

In sum, the Court finds no basis to suppress in this matter and thus recommends that the District Court DENY the motion.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of said statute. As defined by § 636(b)(1), Rule 59(b), and local rule, within ten days after being served with a copy of this recommended disposition, any party may serve and file written objections to any or all portions for consideration, de novo, by the District Court. The parties should consult said statute and rule for appeal rights and mechanics.

This the 17th day of March, 2008.



Signed By:
*Robert E. Wier* REW
United States Magistrate Judge

G:\01-Clerk\Suppression\08-02 Horn suppress.wpd