UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | Criminal Action No. 6: 08-02-DCR |
| V. | ) ) | |
| LATOYA MARIE HORN, | ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of Defendant Latoya Marie Horn's Objections [Record No. 41] to United States Magistrate Judge Robert E. Wier's Recommended Disposition of her Motion to Suppress. [Record No. 38] The Magistrate Judge found that Horn's motion should be denied because the police lawfully stopped her based on reasonable suspicion. In her Objections, Horn contends that the police did not have reasonable suspicion under the Sixth Circuit's analysis in *United States v. Hudson*, 405 F.3d 425 (6th Cir. 2005). After reviewing the parties' briefs, the Magistrate Judge's Recommended Disposition and the relevant law *de novo*, this Court agrees with the Magistrate Judge's analysis and recommendation. Therefore, Horn's Motion to Suppress will be denied.

**I.    Background**

The Indictment in this matter stems from an investigation into the alleged possession and distribution of Oxycontin by Horn and co-Defendant Andre Deshawn Lundy. On January 7, 2008, a confidential source ("CS") informed Detective Brian Centers of the Barbourville Police

Department and DEA Special Agent Jerel Hughes that he had obtained "large quantities" of Oxycontin from Lundy, "over an extended period of time." [Record No. 37, p. 8] The CS further agreed to cooperate in an investigation which ultimately led to the seizure of Horn at the Sonic restaurant in Corbin, Kentucky. The statements and evidence obtained in connection with this incident are the subject of Horn's Motion to Suppress.

At the evidentiary hearing before the Magistrate Judge, Agent Hughes testified that he first met the CS on January 7, 2008, when the CS informed Hughes that he had been dealing with Lundy "for an extensive period of time." [*Id.*] Hughes then had the CS make a recorded phone call to Lundy "to make sure that he could really do what he said he could do." [*Id.*, p. 9] Subsequently, on January 12, 2008, the CS informed Detective Centers that Lundy would be in the area the following day, January 13, 2008, to make a sale. The CS described Lundy as a black male from Detroit, Michigan and noted that he used rental cars to conduct the transactions. [*Id.*, p. 14] However, on January 13, 2008, the CS reported that Lundy was in Tennessee and would be sending his sister to make the sale. [*Id.*, p. 10]

According to Hughes' testimony, the CS made contact with Lundy from his residence outside the presence of the officers, then left his resident to travel to Corbin, Kentucky. Agent Hughes testified that he was "curious" about the CS's decision to travel to Corbin, so he located the CS and followed him "around Corbin for a short period of time." [*Id.*, p. 11] After the CS made two stops, Agent Hughes approached the vehicle and gained the CS's consent to search his person. [*Id.*] The agent found a syringe and a spoon that appeared to contain drug residue.

Agent Hughes then took the CS into custody and determined that the CS could not engage in a meeting or exchange of any kind on that date. [Record No. 37, p. 11]

However, because the CS was in custody, Agent Hughes allowed him to continue negotiations with Lundy under the supervision of Detective Centers. [*Id*., p.12] The CS agreed that he would meet Lundy's sister at the Sonic restaurant in Corbin, Kentucky, at 3:00 p.m., and Detective Centers relayed this information to Agent Hughes by radio. Agent Hughes and several other DEA agents set-up surveillance at the Sonic, and the CS continued to make and receive calls from Lundy in anticipation of the deal. Lundy subsequently told the CS that his sister was "there waiting on you," and Detective Centers immediately relayed this information to Agent Hughes, who was also already present at the Sonic. [*Id*., p. 13]

Based on his experience and the information gained in the investigation, Agent Hughes testified that he immediately suspected the vehicle driven by Horn to be that of Lundy's "sister." [*Id*., p. 14-15] More specifically, Agent Hughes stated that,

> [w]e observed Ms. Horn in a car with an Ohio license plate on it. Task Force Officer Chris Edwards ran the tag. It came back to a rental car company. . . .
>
> At that point we had been told by the confidential informant previously that Mr. Lundy drove rental cars and we knew that he was a black male. He said his sister would be at the Sonic at that time. We assumed that she would be a black female, him being a black male.
>
> So at that point we had the only black female at the Sonic at the designated time, designated location, in a rental car.

[*Id*.]

In light of these facts, Agent Hughes pulled his vehicle past Horn's parking space, blocking her exit from the restaurant, and approached the driver side door. After showing Horn

3

his badge, Agent Hughes asked to see her identification, and Horn produced a driver's license showing her address in Detroit, Michigan.

Agent Hughes testified that, based on the connection to Detroit, which was also consistent with the CS's information, he believed he had the right person and asked for consent to search her vehicle. [*Id.*, p. 19] At that time, Horn gave consent and told the officers that there were no pills in the car but that there were pills in Room 204 at the Knights Inn. [*Id.*] The ensuing search of the vehicle yielded a room key to the Baymont Inn, but no narcotics. Agent Hughes then asked Horn if she had any pills on her person, and she said she did not. Horn consented to the search of her person, but the officers were unable to do a full body search because a female officer was not present. However, Agent Hughes did "observe a bulge to the left of her crotch area." [*Id.*, p.21] He placed Horn in the back of the police car and had her transported to London to be searched by a female dispatcher.

After Horn exited the police cruiser, the officers were not able to find any pills on her person. However, 270 Oxycontin pills were found in the backseat area of the cruiser that transported Horn to London. In a subsequent interview, Horn admitted that she had placed the pills in her crotch area and "shook them down her leg" to conceal them in the police car. [*Id.*, p. 23]

In her Motion to Suppress, Horn contends that the drugs and incriminating statements obtained by the police are inadmissible as the fruits of an impermissible investigatory detention initiated by Agent Hughes at the Sonic. In response, the United States asserts that the incident

4

at the Sonic was consensual, but, even if it was a seizure within the meaning of the Fourth Amendment, the United States contends that the officers had the requisite reasonable suspicion.

The Magistrate Judge found that the encounter at the Sonic restaurant did amount to an investigative detention based on the fact that Agent Hughes positioned his car in a manner that prevented Horn from leaving the Sonic parking lot. However, the Magistrate Judge concluded that the stop was permissible because Agent Hughes identified sufficient articulable facts to support reasonable suspicion. Accordingly, the Magistrate Judge recommended that this Court deny Horn's Motion to Suppress. Horn filed her objections to the Magistrate Judge's Recommended Disposition on March 21, 2008, based solely on the Magistrate Judge's finding that the officers had reasonable suspicion to detain her at the Sonic restaurant.

**II.  Analysis**

A district court must make a *de novo* determination of those portions of a magistrate judge's report and recommendation to which an objection is made. 28 U.S.C. § 636(b)(1)(C). However, "[i]t does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings." *Thomas v. Arn*, 474 U.S. 140, 150 (1985). In the present case, Horn's objections are based solely on the Magistrate Judge's conclusion that Agent Hughes had reasonable suspicion to detain her for investigatory purposes. [Record No. 41] Neither party objected to the Magistrate Judge's conclusion that the stop was an investigative detention rather than a consensual encounter. However, having reviewed the record and the relevant law *de novo*, this Court agrees that the encounter amounted to a non-consensual investigatory detention

because Horn was not able to leave the Sonic parking lot. *See United States v. Davis*, 514 F.3d 596, 607 (6th Cir. 2008).

Accordingly, because the Court finds that the stop was a non-consensual investigatory detention, the United States must demonstrate that the officers had "a reasonable suspicion, supported by articulable facts, that criminal activity has occurred or is about to occur." *Id*. at 607-08 (quoting *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005)). This type of stop is commonly referred to as a *Terry* stop, *see Terry v. Ohio*, 392 U.S. 1 (1968), and requires a two-step analysis to determine its constitutionality. *Davis*, 514 F.3d at 608. First, the Court must determine "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion." *Id*. (quoting *Davis*, 430 F.3d at 354). Then, the Court must examine "whether the degree of intrusion . . . was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *Id*.

In considering whether law enforcement had reasonable suspicion to stop a suspect, the Court must look at the totality of the circumstances to determine if "the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id*. (quoting *Cortez*, 449 U.S. at 418). Further, "[a]lthough an

officer's reliance on a mere "hunch" is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id*. (internal citations and quotations omitted).

In the present case, based on the totality of circumstances and information available to Agent Hughes at the time of Horn's detention, it is clear that the officers had at least reasonable suspicion to justify the stop. The CS had previously informed the officers that they were looking for a black female in a rental car at the Sonic restaurant in Corbin, Kentucky. The CS had demonstrated that this information was reliable through his recorded conversations with Lundy in the presence of the officers, as well as through his continued communication with Lundy on the date the transaction was set to take place. Additionally, when Lundy informed the CS that his sister was already waiting at the Sonic, Horn was the only individual present who fit the description. Based on his experience and training, Agent Hughes reasonably inferred that Horn was Lundy's sister and that she was at the Sonic to distribute the narcotics to the CS.

However, Horn asserts that these factors do not amount to reasonable suspicion under the Sixth Circuit's analysis in *United States v. Hudson*, 405 F.3d 425 (6th Cir. 2005). In that case, Hudson was charged with armed robbery, but had evaded arrest for over a year. *Hudson*, 405 F.3d at 428. The officers received an anonymous tip that a woman suspected to be Hudson's girlfriend worked at a particular place and would be arriving to work at a particular time, driving a particular car. The officer confirmed the information with the employer, but could not confirm that the woman was Hudson's girlfriend. Based on the tip and the corroboration by the

employer, the officers seized a vehicle fitting the description at the girlfriend's work and ultimately arrested Hudson, who was a passenger in the vehicle. *Id.* at 429

On review, the Sixth Circuit held that the encounter was an impermissible *Terry* stop under the totality of the circumstances. *Id.* at 434. The Court focused on the fact that the tip was anonymous and that the officers did not have any credible information that Hudson would be present in the vehicle. According to the Court, "the scope of the anonymous tip, that is, what the tipster said and the tipster did not say, is determinative." *Id.* at 432. In particular, the Court stated that,

> this is not a case about sufficiently corroborating a tip – the officers appear to have done that – but a case about what information the tip provided in the first place. . . The record in this case demonstrates that the officers had no more than a hunch that Hudson would be accompanying Potts to work on the day in question and no more than a hunch that one of the passengers in Potts's car was Hudson.

*Id.* at 434. Finally, the Court noted that Hudson was wanted for a completed crime, not an ongoing or recent crime, and that the officers did not attempt to identify Hudson as the suspected person until after the stop. *Id.* at 438. The Court concluded that "the officers' bare hope of finding a suspect at a particular location does not constitute a particularized an objective basis for seizing, even temporarily, a vehicle and its occupants at that location." *Id.*

The facts in the present case are distinguishable from the facts presented in *Hudson*. First, the informant in this case was not anonymous and had demonstrated reliability through his continued communication with Lundy. It is well-settled that "tips from reliable informants may be used as the basis for a *Terry* stop." *Davis*, 514 F.3d at 608 (citing *Adams v. Williams*, 407 U.S. 143, 147 (1972)). Second, the tip provided by the CS in the present case was much more

8

detailed and involved ongoing communication with Lundy such that the CS was able to inform the officers that the contact was already at the Sonic. This information allowed the officers to evaluate the scene and determine that only one person and vehicle fit the description provided. Thus, the officers had a reasonable basis for suspecting Horn to be the contact because she was (1) the only black female present (2) at the designated place (3) in a rental car (4) when Lundy informed the CS that his sister was waiting for him.

Moreover, the Court in *Hudson* specifically noted that it was addressing the unusual situation in which a defendant is stopped in connection with a crime completed over a year before. *Hudson*, 405 F.3d at 436-37 ("Furthermore, we are mindful that in this case the police were not attempting to solve a recently committed crime, or an ongoing one, but rather to arrest a person suspected of having committed a felony over a year earlier."). According to the Court,

> [t]he factors in the balance may be somewhat different when a stop to investigate past criminal activity is involved rather than a stop to investigate ongoing criminal conduct. This is because the governmental interests and the nature of the intrusions involved in the two situations may differ. As we noted in *Terry*, one general interest present in the context of ongoing or imminent criminal activity is "that of effective crime prevention and detection." *Terry*, 392 U.S. at 22. A stop to investigate an already completed crime does not necessarily promote the interest of crime prevention as directly as a stop to investigate suspected ongoing criminal activity. Similarly, the exigent circumstances which require a police officer to step in before a crime is committed or completed are not necessarily as pressing long afterwards. Public safety may be less threatened by a suspect in a past crime who now appears to be going about his lawful business than it is by a suspect who is currently in the process of violating the law. Finally, officers making a stop to investigate past crimes may have a wider range of opportunity to choose the time and circumstances of the stop.

*Id.* at 437 (quoting *United States v. Hensley*, 469 U.S. 221, 228-29 (1985)).

Here, the officers reasonably suspected that Horn was involved in an ongoing crime, as she was the only person present at the designated time and place who fit the description provided by the CS. The officers had information that Lundy had supplied large quantities of Oxycontin pills to the area over an extended period of time and reasonably decided to stop Horn to prevent the ongoing illegal activity. Therefore, based on the totality of circumstances, the Court finds that Agent Hughes permissibly engaged in a *Terry* stop to briefly detain Horn for investigatory purposes.

Furthermore, the scope of the stop was reasonable, as Hughes merely asked Horn to provide identification. Generally, requests for identification during a *Terry* stop are constitutional "so long as the request is reasonably related to the detention." *United States v. Christian*, 356 F.3d 1103, 1107 (9th Cir. 2004). In this case, the request obviously related to the stop as Agent Hughes was trying to determine whether Horn was the "sister" sent by Lundy. The CS had previously informed Hughes that Lundy was from Detroit, Michigan, and Horn's identification indicated that she was also from Detroit. After learning that Horn was from Detroit, Agent Hughes also reasonably requested consent to search her vehicle. According to the testimony at the hearing, this request prompted Horn to state that there were not any pills in the car, but that there were pills at the Knights Inn. She consented to the search of her vehicle and her person, which eventually led to the discovery of the pills in the back seat of the cruiser.

Under these facts, the Court finds that the initial stop and the scope of the investigation were reasonable based on the clearly articulable facts provided by the CS and corroborated by Agent Hughes. Agent Hughes demonstrated a particularized and objective basis for suspecting

that Horn was engaging in illegal activity, and his inferences were reasonable based on the facts presented, including the information provided by the CS.

### III. Conclusion

For the forgoing reasons, it is hereby

**ORDERED** as follows:

1. United States Magistrate Judge Robert E. Wier's Recommended Disposition [Record No. 38] is **ADOPTED** and **INCORPORATED** by reference.

2. Defendant Latoya Marie Horn's Motion to Suppress [Record No. 29] is **DENIED** and her Objections [Record No. 41] to the Magistrate Judge's Recommended Disposition are **DENIED**.

This 27th day of March, 2008.



Signed By:
*Danny C. Reeves*  DCR
United States District Judge